No. 00-075

IN THE SUPREME COURT OF THE STATE OF MONTANA

2001 MT 54

GENERAL CONSTRUCTORS, INC.,

a Montana Corporation,

Plaintiff and Appellant,

v.

CHEWCULATOR, INC., a Montana Corporation,

and CARL SEIFERT, Individually,

Defendants and Respondents.

APPEAL FROM: District Court of the Twentieth Judicial District,

In and for the County of Lake,

The Honorable Michael C. Prezeau, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

John H. Gilliam, Skjelset & Gilliam, Missoula, Montana

For Respondents:

F. L. Ingraham, Ingraham Law Office, Ronan, Montana (Chewculator, Inc.); Matthew H. O'Neill, French, Mercer, Grainey & O'Neill, Polson, Montana (Carl Seifert)

Submitted on Briefs: June 29, 2000
Decided: April 5, 2001

Filed:

_____

Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 Plaintiff General Constructors, Inc. (GCI), appeals from an order dismissing its claim entered by the Twentieth Judicial District Court, Lake County, in favor of the Defendants Chewculator, Inc. (Chewculator) and Carl Seifert (Seifert), individually, pursuant to the Defendants' motion to dismiss for lack of subject matter jurisdiction.

¶2 We affirm.

¶3 GCI raises the following issue:

> Did the District Court err in finding it lacked subject matter jurisdiction over a breach of contract dispute between two Montana corporations, and a non-Indian minority shareholder of one of the corporations, for work performed within the boundaries of the Flathead Reservation?

## FACTUAL AND PROCEDURAL BACKGROUND

¶4 This dispute arose from a 1993 construction project on the Pablo Dam located in Lake County, and within the boundaries of the Flathead Indian Reservation.

¶5 The project bid specifications, published by the Confederated Salish and Kootenai Tribes (hereinafter CSKT) included a provision requiring that all contractors and subcontractors must adhere to a tribal policy "to expand the opportunities for tribal members and Indian-owned businesses to receive preference in employment, subcontracts, and the procurement of equipment and supplies, in connection with work to be performed under this contract." The CSKT project rules also stated that the foregoing requirement "shall apply to bidders, the Contractor, and subcontractors at any tier, regardless of their status as a non-Indian Business, an Indian-owned business, or a CSKT business."

¶6 CSKT awarded Dick Anderson Construction, a Montana corporation, the general contract in July 1993. Dick Anderson Construction then solicited bids for a subcontract to haul and screen gravel. GCI claims that it submitted the low bid, but the subcontract was awarded to Chewculator based on its claimed preference as an Indian-owned business. GCI does not dispute the fact that Chewculator's majority shareholder is Tina Marie Dupuis Walton, who is a Consolidated Salish and Kootenai tribal member. Carl Seifert, who formed the corporation in 1982 for the purported purpose of manufacturing and distributing novelty items, transferred a majority share interest to Walton in 1993.[1]

¶7 On October 1, 1993, GCI entered into a subcontract with Chewculator pursuant to Chewculator's contract with Dick Anderson Construction. GCI agreed to screen the gravel for the Pablo Dam project. GCI allegedly completed performance under the contract, and neither Chewculator nor Seifert paid the final bill of $16,000 submitted by GCI. Chewculator generally alleged that GCI failed to perform in accordance with contract specifications, causing both it and Dick Anderson Construction to incur damages, and therefore withheld final payment on the contract.

¶8 On August 17, 1994, GCI filed an amended complaint in this matter, alleging breach of contract against Chewculator and Seifert, individually, and claiming damages in the amount of $16,800. Under Count II, GCI acknowledged that prior to entering the contract with Chewculator, Seifert informed GCI of Chewculator's preference with CSKT. GCI claimed Seifert had nevertheless agreed to personally guarantee payment under the subcontract.

¶9 On June 19, 1995, the District Court entered an order in favor of Seifert, ostensibly dismissing him, individually, from this matter under the personal guarantee claim based on a parol evidence ruling.

¶10 GCI moved in July of 1995 for a leave to amend its complaint again. In the second amended complaint dated July 14, 1995, GCI specifically alleged that due to Chewculator's and Seifert's commission of fraud in falsely claiming Chewculator was an Indian-owned business, GCI had been damaged in that it had not been awarded the subcontract with Dick Anderson Construction. Thus, GCI drew Seifert, individually, back into the controversy under this allegation. Under a separate count, GCI for the first time also claimed that Dick Anderson Construction had been negligent in not investigating Chewculator's status as an Indian-owned business prior to awarding it the subcontract over GCI, and in turn this alleged negligence had caused GCI to incur damage.

¶11 The District Court granted GCI's motion for leave to file the second amended complaint on October 11, 1996. The amended complaint was filed on October 15, 1996.

¶12 GCI moved yet again for a leave to amend its complaint on April 8, 1997. Under Count III, GCI specifically and in more detail alleged that Chewculator's purported status as an Indian-owned business was fraudulent. Under Count IV, GCI also pursued a cause of action against Chewculator and Seifert under the designation of "PIERCING THE CORPORATE VEIL." Further, the proposed amended complaint named as additional defendants Glacier Sand & Gravel (a business owned by Seifert), Seifert Construction, Randy and Tina Walton (d/b/a Walton Construction), L.A. Construction, Inc., and "John Does 1-5."

¶13 In the face of the foregoing motion for leave to amend the complaint a third time, the Defendants moved to dismiss, claiming in part that the District Court lacked subject matter jurisdiction. The Defendants contended that the CSKT tribal court, not the Twentieth Judicial District Court, had proper subject matter jurisdiction. Specifically, Chewculator contended that Tina Walton, a tribal member, was the majority shareholder in Chewculator, and therefore Chewculator was an Indian-owned corporation over which the District Court lacked jurisdiction. GCI countered that Chewculator was in fact the alter ego of Seifert, who transferred 51 percent of Chewculator's stock to Walton for the sole purpose of fraudulently gaining preference under CSKT's project guidelines.

¶14 The District Court entered its order granting the Defendants' motion to dismiss on November 15, 1999. After reciting the general rules for determining subject matter jurisdiction in cases such as this--involving a civil matter arising on tribal lands--the court reached its ultimate determination on two grounds. The court determined that the CSKT tribal court has "sole jurisdiction to hear all commercial disputes which arise on the reservation and involve a tribal defendant." Thus, the court determined that whether or not Chewculator was, in fact, an Indian-owned business, was a matter that must properly be addressed by the tribal court. The court then determined that any allegation of fraud or impropriety concerning CSKT's policy for giving preference to Indian-owned businesses "necessarily implicates tribal self-government."

¶15 The District Court concluded that it lacked subject matter jurisdiction, and granted the Defendants' motion to dismiss. GCI appealed.

## STANDARD OF REVIEW

¶16 When deciding a motion to dismiss based on lack of subject matter jurisdiction, a trial court must determine whether the complaint states facts that, if true, would vest the court with subject matter jurisdiction. *Liberty Northwest Ins. Corp. v. State Compensation Ins. Fund*, 1998 MT 169, ¶ 7, 289 Mont. 475, ¶ 7, 962 P.2d 1167, ¶ 7. A court's determination that it lacks subject matter jurisdiction is a conclusion of law which we review to determine whether the court's interpretation of the law is correct. *In re McGurran*, 1999 MT 192, ¶ 7, 295 Mont. 357, ¶ 7, 983 P.2d 968, ¶ 7 (citation omitted).

¶17 Motions to dismiss should be construed in a light most favorable to the non-moving party and should not be granted unless it appears beyond a doubt that the non-moving party can prove no set of facts in support of its claim which would entitle it to relief. *Stenstrom v. State* (1996), 280 Mont. 321, 325, 930 P.2d 650, 652.

## ISSUE RAISED

*Did the District Court err in finding it lacked subject matter jurisdiction over a breach of contract dispute between two Montana corporations, and a non-Indian minority shareholder of one of the corporations, for work performed within the boundaries of the Flathead Reservation?*

¶18 GCI raises the foregoing issue in light of its contention that in order to hold Seifert personally liable for Chewculator's debt, it seeks to pierce Chewculator's corporate veil due to fraud allegedly committed by Seifert against CSKT.

## DISCUSSION

¶19 GCI argues that a corporation, even if Indian-owned, is neither an "Indian" nor a "tribal member" for the purpose of determining subject matter jurisdiction. It has long been the rule in Montana, GCI contends, that a corporation is not a person. GCI contends, therefore, that the finding by the District Court that Chewculator's Indian-ownership was relevant was the court's "first fundamental flaw."

¶20 On appeal, GCI insists that this dispute involves nothing more than one Montana corporation bringing a claim for money damages against another Montana corporation, and that the proper resolution of this dispute should inevitably allow GCI to avail itself to the personal assets of Seifert, a non-tribal member. Thus, this is "a dispute between non-

Indians" that "does not call into question any tribal act." GCI does not contest, however, that this dispute involves transactions taking place solely within the exterior boundaries of the Flathead Indian Reservation.

¶21 GCI directs this Court's attention to a fairly thorough and accurate recital of federal law on the subject of tribal sovereignty and state court subject matter jurisdiction. In summary, the U.S. Supreme court, in *Montana v. U. S.* (1981), 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493, delineated two exceptions to the general proposition that the inherent sovereign powers of an Indian tribe do not extend to the activities of non-members of a tribe. The first exception recognizes that a tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements. The second exception acknowledges a tribe's inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe. *See generally Yellowstone County v. Pease* (9th Cir. 1996), 96 F.3d 1169, 1174 (citing and quoting *Montana v. U. S.* (1981), 450 U.S. 544, 565-66, 101 S.Ct. 1245, 1258).

¶22 GCI argues that unless one of the *Montana* exceptions applies, there is no presumption of tribal jurisdiction. We do not disagree with GCI's rendition of federal authority which defines the interplay between CSKT's exercise of tribal sovereignty and this state's court's exercise of subject matter jurisdiction.

¶23 In turn, GCI should not disagree that under the circumstances described here a Montana state court must follow the three-part test established in *State ex rel. Iron Bear v. District Court* (1973), 162 Mont. 335, 512 P.2d 1292, which was adopted from the U.S. Supreme Court's decision in *Williams v. Lee* (1959), 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251. Under *Iron Bear*, to determine whether a state court may assume subject matter jurisdiction where tribal "adjudicatory" sovereignty over a civil dispute arising on a reservation may be involved, a court looks at whether:

    (1) the federal treaties and statutes applicable have preempted state jurisdiction;

    (2) the exercise of state jurisdiction would interfere with reservation self-government; and

(3) the Tribal Court is currently exercising jurisdiction or has exercised jurisdiction in such a manner as to preempt state jurisdiction.

*Iron Bear*, 162 Mont. at 346, 512 P.2d at 1299. *See also In re Marriage of Skillen*, 1998 MT 43, ¶ 44, 287 Mont. 399, ¶ 44, 956 P.2d 1, ¶ 44 (distinguishing Iron Bear's adjudicatory sovereignty analysis from two-part "regulatory dispute" test adopted from White Mountain Apache Tribe v. Bracker (1980), 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665).

¶24 The two-part *White Mountain Apache* test, as discussed by this Court in *Skillen*, similarly asks: (1) whether the assertion of subject matter jurisdiction by Montana's administrative and judicial tribunals is preempted by federal law, and (2) whether the assertion of subject matter jurisdiction by Montana's administrative and judicial tribunals would unlawfully infringe on the tribe's right to make its own laws and be ruled by these laws.[2] *See Marriage of Skillen*, ¶ 44 (citing *First v. State Dept. of Soc. & Rehab. Serv. ex rel. LaRoche* (1991), 247 Mont. 465, 471, 808 P.2d 467, 470).

¶25 In following the *Iron Bear* test, the District Court correctly observed that, pursuant to U.S. Supreme Court case law, if either of the first two prongs under the three-part test are established, the state lacks subject matter jurisdiction. *See Milbank Mut. Ins. Co. v. Eagleman* (1985), 218 Mont. 58, 61, 705 P.2d 1117, 1119. In framing its analysis under the second prong of *Iron Bear*, the District Court turned to this Court's decision in *Milbank*--which in turn relied on a Ninth Circuit decision. *See Milbank*, 218 Mont. at 62, 705 P.2d at 1119-20 (citing *R.J. Williams Co. v. Fort Belknap Housing Auth.* (9th Cir. 1983), 719 F.2d 979, 983-84). In *Milbank*, we stated that a tribe's interest in self-government for civil matters arising within a reservation's boundaries can be implicated in one of two ways: (1) when a state or federal court resolves a dispute that impinges upon the tribe's right to adjudicate controversies arising within the "province of the tribal courts"; and (2) the dispute itself calls into question the validity or propriety of an act fairly attributable to the tribe as a government body. *Milbank*, 218 Mont. at 62, 705 P.2d at 1119-20.

¶26 The District Court's rationale and ultimate determination under *Iron Bear* and *Milbank* can be distilled into two questions: was Chewculator an Indian-owned business for the purposes of preference under the subcontract with Dick Anderson Construction? and, did Chewculator or Seifert, individually, commit fraud upon CSKT or otherwise violate CSKT's preference policy to the detriment of GCI? Determining that the answers to both of these questions were integral to the ultimate resolution of this matter, and that both

clearly implicated the jurisdiction of CSKT's tribal court as well as its policy-making authority, the court concluded it could not assert jurisdiction "without violating the policy favoring tribal self-government or interfering with the Tribe's right to self-government."

¶27 We agree with the rationale expressed by the District Court.

¶28 First, pursuant to our standard of review, there are several immutable facts that GCI has either conceded or cannot disprove: the dispute resulted from transactions taking place within the exterior boundaries of the Flathead Reservation; Walton is a tribal member; Seifert transferred a 51-percent ownership interest in Chewculator to Walton in July of 1993, prior to entering the subcontract with Dick Anderson Construction; in August of 1993, CSKT's contract officer approved Chewculator as a tribal member-owned business thus entitling it to preferential treatment; and, in October of 1993, GCI entered a subcontract with Chewculator aware that Chewculator had preferential status with CSKT.

¶29 Another material factor in this matter that GCI has attempted to hedge is that its claims for relief require not only a determination of the rights and obligations under its contract with Chewculator, but also a determination of the validity of the preferential status afforded Chewculator by CSKT. GCI asserts, in essence, that if all parties concerned had played by the rules as set forth by CSKT, GCI--not Chewculator--would have received the subcontract with Dick Anderson Construction. Thus, GCI's fraud claim, as well as its negligence claim against Dick Anderson Construction, have little or nothing to do with its breach of contract dispute over Chewculator's nonpayment under its subcontract with GCI.

¶30 With these factors in mind, and disregarding all questions concerning the merits of its fraud claim, we observe as did the District Court that GCI cannot avoid the inevitable obstacle it must overcome in order to prevail. Inevitably, GCI must prove that either Chewculator or Seifert or both committed fraud upon CSKT as alleged. As GCI's own "statement of issue" sets forth in its brief, the basis of its claim for piercing Chewculator's corporate veil is the "fraud by the non-Indian minority shareholder *against the Tribe*." (Emphasis added). To prevail, GCI must demonstrate that Chewculator was not "Indian-owned" under the written requirements established by CSKT.

¶31 Contrary to GCI's argument, therefore, the factual and legal determination of what constitutes "Indian-owned" for the purpose of gaining preferential treatment in contracts with CSKT or in subcontracts with contractors in privity with CSKT, as set forth in

CSKT's own written statement of governing rules and policies, clearly raises the presumption of tribal jurisdiction--either regulatory or adjudicatory--under both *Montana* exceptions. *See Montana*, 450 U.S. at 565-66, 101 S.Ct. at 1258; *Pease*, 96 F.3d at 1174 (tribe may regulate consensual relationships between non-Indians and the tribe or its members; and tribe has inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct directly effects the political integrity of the tribe).

¶32 Likewise, the determination of whether a business is "Indian-owned" invokes both criteria set forth in *Milbank* for determining the second prong of *Iron Bear*: (1) whether a state court would impinge upon the tribe's right to adjudicate controversies arising within the "province of the tribal courts;" and (2) whether the dispute itself calls into question the validity or propriety of an act fairly attributable to the tribe as a government body. *See Milbank*, 218 Mont. at 62, 705 P.2d at 1119-20.

¶33 Although this Court is not being asked to interpret CSKT's preference policy, such a legal interpretation would be--contrary to GCI's argument--*inevitable* in order to grant the specific relief requested by GCI under its amended complaints. To assume jurisdiction and decide whether a corporation had committed fraud upon CSKT or a contractor in privity with CSKT--or decide whether a corporation should or should not be deemed "Indian-owned" in spite of a prior determination by CSKT--would clearly require that a District Court in Montana impinge upon CSKT's right to adjudicate controversies arising within the province of its own courts.

¶34 For the sake of illustration, under our standard of review, even if we assume that all allegations introduced by GCI in this matter are true, it is nevertheless quite possible that Seifert's and Chewculator's course of dealing was perfectly acceptable with CSKT in light of its laws and policies governing the administration of contracts on tribal lands. Such a determination--regardless of whether GCI believes it involves fraud, or it is unfair, or it gives rise to bad public policy--is the essence of CSKT's sovereign right to adjudicate disputes involving commercial activities that occur within the exterior boundaries of the reservation. *See generally Marriage of Skillen*, ¶ 56 (citing *Iowa Mut. Ins. Co. v. LaPlante* (1987), 480 U.S. 9, 18, 107 S.Ct. 971, 977, 94 L.Ed.2d 10, 16).

¶35 Next, under the second factor identified in *Milbank*, the fraud dispute instigated by GCI calls into question the validity or propriety of acts fairly attributable to CSKT as a government body--that is, the determination of what is or is not an "Indian-owned"

business, and what preferences should be afforded to tribal members engaged in contractual relations with CSKT.

¶36 Accordingly, we hold that the District Court correctly set forth and applied the law of tribal sovereignty and state court subject matter jurisdiction to the case at bar in reaching the determination that GCI's action must, as a matter of law, be dismissed.

¶37 As a final argument, GCI claims that at the very least, the District Court erred by making its determination that it lacked subject matter jurisdiction without a preliminary hearing.

¶38 We do not disagree with GCI that this Court has stated that where material "jurisdictional facts" are disputed, the appropriate procedure is a preliminary hearing by the District Court pursuant to Rule 12(d), M.R.Civ.P. *See Minuteman Aviation, Inc. v. Swearingin* (1989), 237 Mont. 207, 212, 772 P.2d 305, 308-09 (addressing motion to dismiss for lack of personal jurisdiction). Further, Rule 12(d), M.R.Civ.P, provides that the defense of lack of subject matter jurisdiction pursuant to Rule 12(b)(1) "shall be heard and determined before trial on application of any party . . . ."

¶39 Our standard of review for subject matter jurisdiction claims--in contrast to the *de novo* review employed by the Ninth Circuit to which GCI cites--requires that the trial court determine whether the complaint states facts that, if true, would vest the court with subject matter jurisdiction. *See Liberty Northwest*, ¶ 7; *and compare with Ma v. Reno* (9th Cir.1997), 114 F.3d 128, 130. As the above discussion reveals, even if a court presumed all allegations made by GCI were true, a Montana court could not assume subject matter jurisdiction as a matter of law.

¶40 Also, the procedural record reveals that GCI on September 7, 1999, gave notice to the court that it intended to file for a writ of supervisory control, unless the court would "*either* issue its Orders *or* schedule an emergency hearing on all pending motions," which included the Defendants' motion to dismiss due to lack of subject matter jurisdiction. (Emphasis added). GCI filed a nearly identical notice with the District Court on July 26, 1999. Earlier, on June 21, 1999, GCI merely requested that the court "rule on the following Motions." Prior to that, on April 7, 1999, GCI gave notice that the motions "are at issue and ripe for ruling." Accordingly, we hold that, given the choice offered by GCI's "application," the court did not err by issuing its order rather than scheduling and conducting a hearing.

¶41 Affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ W. WILLIAM LEAPHART

/S/ JIM REGNIER

/S/ TERRY N. TRIEWEILER

1. According to its articles of incorporation, the corporate name "*Chewculator*" derives from its product, a "retail tobacco can calculator," which Chewculator, Inc., intended to distribute wholesale.

2. We observe that the District Court did not err in not citing to the *White Mountain Apache* test in determining that Walton's status as a tribal member and majority shareholder of Chewculator involved issues of CSKT's right to self government in terms of policy making, rather than its adjudicatory function. The second prong of either *Iron Bear* or *White Mountain Apache* would essentially yield the same results here. Both focus on whether a Montana state court's assumption of jurisdiction would interfere with a tribe's sovereign right of self-government in either adjudicatory or regulatory matters.