No. 04-595

IN THE SUPREME COURT OF THE STATE OF MONTANA

2006 MT 220

DARWIN CLOVERTON ZEMPEL,

Plaintiff and Appellant,

v.

LENORA LINDA LIBERTY, JOHN HERAK,
and TINY'S TAVERN OF CHARLO, INC.,

Defendants and Respondents.

APPEAL FROM: The District Court of the Twentieth Judicial District,
In and For the County of Lake, Cause No. DV 2004-03,
Honorable C.B. McNeil, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

William L. Managhan, Managhan Law Firm, PLLC, Kalispell, Montana

For Respondents:

Kati G. Kintli, Browning, Kaleczyc, Berry & Hoven, P.C.,
Helena, Montana

John Herek, *pro se*, Dixon, Montana

Submitted on Briefs:  April 5, 2005

Decided:  September 6, 2006

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 Darwin Cloverton Zempel ("Zempel") appeals from the orders of the District Court of the Twentieth Judicial District, Lake County, which dismissed his negligence claim against Lenora Linda Liberty ("Liberty"), John Herak ("Herak"), and Tiny's Tavern of Charlo, Inc. ("TTC"). We affirm in part, reverse in part, and remand.

¶2 In this appeal, we address the issue of tribal jurisdiction over a suit to which a non-tribal member is a party. We receive this appeal pursuant to the District Court's decision to dismiss the suit on jurisdictional grounds. Thus, we must determine whether the court erred in this regard.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 The Flathead Indian Reservation is located in northwestern Montana and is home to the Confederated Salish and Kootenai Tribes ("CSKT"). TTC, a Montana corporation, operates a bar in the town of Charlo, which is located within the exterior boundaries of the Reservation. TTC's sole shareholder, Liberty, is a tribal member.

¶4 Zempel, who is not a tribal member, spent the evening of July 4, 2003, at TTC. Although he was not yet twenty-one years old, he was repeatedly served alcoholic beverages by one or more bartenders. In the early morning hours of July 5, another patron, Brandy Jo Moore ("Moore"), attempted to drive Zempel home in a car registered to one Tina Zempel. Proceeding south on Montana State Highway 212, Moore lost control of the vehicle, causing it to roll at least twice. Zempel was seriously injured in the accident. Moore sustained fatal injuries and was pronounced dead at the scene.

2

¶5 In January of 2004, Zempel filed a negligence claim against Liberty, Herak, and TTC. The Complaint alleged that: (1) Liberty and Herak were the owners and operators of TTC; (2) TTC's bartenders served Zempel numerous alcoholic beverages even though they knew he was not of legal drinking age; (3) the bartenders continued to serve Zempel after he became visibly intoxicated; (4) Zempel eventually vomited and lost consciousness as a result of the alcohol; (5) Zempel was then placed in the passenger seat of his car; (6) TTC's bartenders continued to serve Moore after she became visibly intoxicated; (7) the bartenders drank alcoholic beverages that evening, while on duty, with Zempel and Moore; (8) the bartenders knew that Zempel was incapacitated, that Moore was intoxicated, and that Moore intended to drive Zempel home; and (9) the bartenders made no effort to stop Moore from attempting to drive Zempel home. Upon these allegations, *inter alia*, Zempel claimed that the Defendants had acted negligently and violated Montana statutory law.[1]

---

[1] Zempel claimed that TTC had violated § 27-1-710, MCA. However, he alleged no facts that would constitute a "violation" of this statute. In fact, § 27-1-710, MCA, does not prohibit the conduct at issue in this case. Rather, it merely "set[s] statutory criteria governing the liability of a person or entity that furnishes an alcoholic beverage for injury or damage arising from an event involving the person who consumed the beverage." Section 27-1-710(1), MCA. Most importantly for Zempel's case, § 27-1-710, MCA, limits the grounds on which a finding of liability may rest. Zempel also claimed that TTC had "violated" § 16-3-301(3), MCA. Although the alleged facts do amount to violations of this statute, another statutory provision states that such violations are *not* a basis for a finding of liability. Specifically, § 27-1-710(2), MCA, provides (with one exception which Zempel has not raised) that "a person or entity furnishing an alcoholic beverage may not be found liable for injury or damage arising from an event involving the consumer wholly or partially on the basis of a provision or a violation of a provision of Title 16." Thus, while Zempel alleged statutory "violations," his suit, as pled, merely amounts to a negligence claim.

3

¶6      Liberty filed a Motion seeking dismissal of both herself and TTC. In doing so, Liberty acted on her own behalf and purported to act on behalf of TTC. With this Motion, Liberty argued that the District Court lacked jurisdiction to adjudicate the dispute because of her status as a CSKT member and TTC's status as an "Indian-owned business." In support of her arguments, she attached a certificate from the CSKT Enrollment Office, verifying her membership with the Tribe. She also attached a certificate, ostensibly issued by CSKT, which classified TTC as a "Certified Indian Preference Business" and identified Liberty as TTC's owner. The District Court dismissed Liberty, stating "this Court lacks jurisdiction over Plaintiff's complaint against a tribal member." The court declined to dismiss TTC, however, noting its status as a Montana corporation.

¶7      Herak also filed a *pro se* Motion to Dismiss wherein he argued that he was not properly named as a defendant. In support of this contention, Herak claimed that he had no ownership interest in TTC. The District Court denied this request without addressing Herak's argument.

¶8      Thereafter, Liberty took a novel approach; she filed a document on behalf of TTC which she identified as a "Response" to the court's Order declining to dismiss the corporation. She also filed another Motion to Dismiss on behalf of TTC. In doing so, Liberty maintained that TTC "is an Indian-owned business and is entitled to Tribal Jurisdiction." To support this contention, Liberty attached copies of a number of business documents, including, *inter alia*: (1) TTC=s Articles of Incorporation, showing

4

the business to have been formed pursuant to the Montana Business Corporation Act; (2) TTC's liquor license, issued by the State of Montana, permitting TTC to sell alcoholic beverages in accordance with Montana law; (3) TTC's gambling operator license, issued by the State of Montana, permitting TTC to operate nine video gaming machines; and (4) a tax assessment for the premises which TTC occupied, issued by the Lake County Treasurer, assessing both state and county taxes.

¶9 Herak also filed a "Response" to the court's denial of his Motion to Dismiss, as well as another Motion to Dismiss. Once again, Herak claimed that he had no ownership interest in TTC. While making the same argument which he had advanced in his first Motion to Dismiss, Herak also referred the court to the documents which Liberty filed with TTC's second Motion to Dismiss.

¶10 The District Court then entered an Order dismissing Herak and TTC and, consequently, dismissing Zempel's Complaint in its entirety. As for Herak's Motion, the Court stated: "Herak has no ownership interest in [TTC or its] liquor license and his motion to dismiss must be granted for the failure of Plaintiff's complaint to state a claim entitling Plaintiff to relief from said Defendant." As for TTC's Motion, the court concluded that it lacked jurisdiction over the corporation, stating: "Liberty is the sole owner and stockholder of said Defendant corporation and its State of Montana liquor license and, therefore, said corporation Defendant is an Indian owned business." Zempel then appealed to this Court.

**STANDARD OF REVIEW**

¶11    When a party seeks dismissal of a suit based on the claim that jurisdiction properly lies in a tribal court, the trial judge must determine whether the complaint states facts which, if true, would vest the district court with subject matter jurisdiction. *See General Constructors, Inc., v. Chewculator, Inc.*, 2001 MT 54, ¶¶ 13, 16, 304 Mont. 319, ¶¶ 13, 16, 21 P.3d 604, ¶¶ 13, 16 (citing *Liberty Northwest Ins. Corp. v. State Compensation Ins. Fund*, 1998 MT 169, ¶ 7, 289 Mont. 475, ¶ 7, 962 P.2d 1167, ¶ 7).  A district court's determination that it lacks subject matter jurisdiction is a conclusion of law which we review to ascertain whether the court's interpretation of the law is correct.  *General Constructors*, ¶ 16 (citing *In re McGurran*, 1999 MT 192, ¶ 7, 295 Mont. 357, ¶ 7, 983 P.2d 968, ¶ 7).

**DISCUSSION**

¶12    Before commencing our jurisdictional analysis we address Herak's dismissal and two issues regarding Liberty's status as an individual defendant in this suit.

¶13    Zempel purports to appeal from the District Court's Order dismissing Herak. However, Zempel has not properly raised Herak's dismissal as an issue in this appeal.  As noted above, while the District Court dismissed TTC and Liberty on jurisdictional grounds, it dismissed Herak for a different reason—i.e., because he had no ownership interest in TTC.   In his initial brief on appeal, Zempel only presents arguments challenging the District Court's conclusions regarding the issue of jurisdiction.  Then, in his reply brief, Zempel presents a short argument challenging the District Court's

6

decision to dismiss Herak. Essentially, Zempel seeks an opportunity to conduct discovery regarding Herak's ties to TTC. We will not address this argument because, as our well-settled precedent dictates, this Court does not consider issues raised for the first time in a reply brief. *Pengra v. State*, 2000 MT 291, ¶ 13, 302 Mont. 276, ¶ 13, 14 P.3d 499, ¶ 13 (citing *Loney v. Milodragovich, Dale & Dye, P.C.*, 273 Mont. 506, 512, 905 P.2d 158, 162 (1995)). Accordingly, the District Court's dismissal of Herak is affirmed.

¶14 As for Liberty's status in this suit, the record does not reveal why Zempel named her, TTC's sole shareholder, as an individual defendant. "Under Montana law, it is well settled that a corporation has a separate and distinct identity from its stockholders." *Moats Trucking Co., Inc. v. Gallatin Dairies, Inc.*, 231 Mont. 474, 477, 753 P.2d 883, 885 (1988) (citations omitted). As such, shareholders are not personally liable for the acts of a corporation, § 35-1-534(2), MCA, unless the distinction between the corporation and the shareholder may be disregarded—i.e., unless the "corporate veil" is pierced, *Peschel Family Trust v. Colonna*, 2003 MT 216, ¶¶ 21-42, 317 Mont. 127, ¶¶ 21-42, 75 P.3d 793, ¶¶ 21-42.

¶15 Zempel's Complaint does not allege any acts attributable to Liberty individually. Thus, it would seem that he may have sought to hold her accountable by piercing the corporate veil which separates Liberty from TTC for liability purposes. Yet, the Complaint does not allege any facts even remotely suggesting that TTC's corporate veil should be pierced in this case. Of course, the fact that Liberty is TTC's sole shareholder

7

"is not, by itself, enough to warrant piercing the corporate veil." *Meridian Minerals Co. v. Nicor Minerals, Inc.*, 228 Mont. 274, 285, 742 P.2d 456, 462 (1987) (citation omitted).

¶16　We recognize that plaintiffs are generally not obligated to name a particular cause of action or plead the specific legal elements of a claim when filing a complaint, as we operate under "notice pleading" rules. *See Kunst v. Pass*, 1998 MT 71, ¶ 35, 288 Mont. 264, ¶ 35, 957 P.2d 1, ¶ 35 (citations omitted). Indeed, pursuant to M. R. Civ. P. 8(a), a complaint must only "put a defendant on notice of the *facts* the plaintiff intends to prove; the facts must disclose the elements necessary to make the claim; and the complaint must demand judgment for the relief the plaintiff seeks." *Kunst*, ¶ 35 (emphasis added) (citation omitted). We are also mindful that complaints must be construed broadly in the plaintiff=s favor when determining whether he or she has stated a claim. *See Fennessy v. Dorrington*, 2001 MT 204, ¶ 9, 306 Mont. 307, ¶ 9, 32 P.3d 1250, ¶ 9 (citation omitted).

¶17　Here, construing the Complaint broadly, and recognizing that plaintiffs are generally not subject to any technical pleading requirements, it nonetheless appears that Zempel failed to state a claim against Liberty. We make this observation because we are troubled by the fact that Liberty was put to the inconvenience and expense of defending herself in this suit even though Zempel failed to provide any justification for naming her as an individual defendant.[2] Having expressed our concern, we will not resolve this issue

---

[2]　We are equally troubled that Zempel has dragged Herak into this litigation, as the Complaint does not state a claim against him. In fact, the record before us contains absolutely nothing to justify Herak's inclusion as a defendant in this suit. Yet, he has been forced to defend himself in the District Court proceedings and in this appeal.

here, as the parties have focused their arguments on the jurisdictional issue.[3]   We presume Liberty will be dismissed on remand unless Zempel properly amends his Complaint, pursuant to M. R. Civ. P. 15(a), to justify her inclusion as a defendant.

¶18   Finally, as we did in *Audit Services, Inc. v. Frontier-West, Inc.*, 252 Mont. 142, 148, 827 P.2d 1242, 1246, (1992), we note another important issue which neither the parties nor the District Court have addressed.   Non-lawyers may not represent corporations in district court proceedings. *Audit Services*, 252 Mont. at 148, 827 P.2d at 1246 (citing *Weaver v. Law Firm of Graybill*, 246 Mont. 175, 178, 803 P.2d 1089, 1091 (1990)) (holding that a corporation is a legal entity which is separate from the agents who act on its behalf, and it can not appear on its own behalf through an agent other than an attorney).   We have explicitly warned the district courts regarding this subject, having identified it as "an issue of importance." *Audit Services*, 252 Mont. at 148, 827 P.2d at 1246.  Indeed, we have observed that a non-lawyer who appears on behalf of another in a district court proceeding is guilty of contempt of court pursuant to § 37-61-210, MCA.[4] *Weaver*, 246 Mont. at 178, 803 P.2d at 1091.

¶19   Here, as noted above, Liberty purported to act on behalf of TTC in the District Court proceedings, filing an initial Motion to Dismiss as well as a "Response" to the District Court's Order and a subsequent Motion to Dismiss. In doing so, she acted in contempt of court.  Liberty is not licensed to practice law in Montana, nor did she claim

---

[3]  Liberty has not filed a brief in this appeal.

[4]   Section 37-61-210, MCA, provides:  "**Penalty for practicing without license.**  If any person practices law in any court, except a justice=s court or a city court, without having received a license as attorney and counselor, he is guilty of a contempt of court."

to be in the proceedings below. Yet, the District Court failed to hold her in contempt. In fact, the court granted one the motions Liberty filed on behalf of TTC, allowing her to "represent" TTC and thereby practice law without a license. Consequently, we again admonish district courts to observe our case law on this important issue and exercise vigilance in ensuring that only licensed legal practitioners represent corporate entities in district court proceedings.[5]

## Tribal Sovereignty

¶20    Turning now to our jurisdictional analysis, we observe the United States Supreme Court's holdings regarding the retained sovereignty of Indian tribes and the extent of tribal civil authority. The Court has stated that "Indian tribes are 'domestic dependent nations' that exercise inherent sovereign authority over their members and territories." *Oklahoma Tax Comm'n v. Potawatomi Tribe*, 498 U.S. 505, 509, 111 S.Ct. 905, 909 (1991) (citation omitted). The Court has also stated:

> Indian tribes are distinct, independent political communities, retaining their original natural rights in matters of local self-government. Although no longer possessed of the full attributes of sovereignty, they remain a separate people, with the power of regulating their internal and social relations. They have power to make their own substantive law in internal matters, [including rules regarding membership, inheritance, and domestic relations] and to enforce that law in their own forums.

*Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 55-56, 98 S.Ct. 1670, 1675 (1978) (internal citations and quotation marks omitted).

---

[5]   TTC has obtained proper representation for this appeal.

¶21     Although Indian tribes possess "attributes of sovereignty" over both their members and their territories, "their dependent status generally precludes extension of tribal civil authority beyond these limits." *Atkinson Trading Co., Inc., v. Shirley*, 532 U.S. 645, 659, 121 S.Ct. 1825, 1835 (2001) (citation omitted).  More specifically, "the inherent sovereignty of Indian tribes [is] limited to their members and their territory:  [E]xercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes." *Atkinson*, 532 U.S. at 650-51, 121 S.Ct. at 1830 (citation and internal quotation marks omitted) (first alteration added, second alteration in original).  Thus, "[t]ribal jurisdiction is limited:  For powers not expressly conferred them by federal statute or treaty, Indian tribes must rely upon their retained or inherent sovereignty." *Atkinson*, 532 U.S. at 649-50, 121 S.Ct. at 1830.

### The *Montana* Rule

¶22     *Montana v. United States*, 450 U.S. 544, 101 S.Ct. 1245 (1981), is "the pathmarking case concerning tribal civil authority over nonmembers." *Strate v. A-1 Contractors*, 520 U.S. 438, 445, 117 S.Ct. 1404, 1409 (1997).  The *Montana* Court enunciated the "general proposition" that "the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." *Montana*, 450 U.S. at 565, 101 S.Ct. at 1258.  To this general rule, the Court then appended two exceptions, noting, "[t]o be sure, Indian tribes retain inherent sovereign power to exercise *some* forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands."

11

*Montana*, 450 U.S. at 565, 101 S.Ct. at 1258 (emphasis added). First, the Court stated: "A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." *Montana*, 450 U.S. at 565, 101 S.Ct. at 1258 (citations omitted). Second, the Court stated: "A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Montana*, 450 U.S. at 566, 101 S.Ct. at 1258 (citations omitted).

¶23 While *Montana* immediately dealt with tribal regulatory authority,[6] it "broadly addressed the concept of 'inherent sovereignty.'" *Strate*, 520 U.S. at 453, 117 S.Ct. at 1413. Subsequent to the *Montana* decision, the Court held in *Strate* that as to non-members, "a tribe's adjudicative jurisdiction does not exceed its legislative jurisdiction." *Strate*, 520 U.S. at 453, 117 S.Ct. at 1413. The *Strate* Court then proceeded to apply *Montana*'s "pathmarking" analysis to determine the extent of tribal civil adjudicative jurisdiction. Particularly, the Court considered whether a tribal court had jurisdiction over a nonmember's personal injury action which arose out of a car accident on a North Dakota state highway running through the Fort Berthold Indian Reservation (land as to which the Tribe at issue could not "assert a landowner's right to

---

[6] The issue in *Montana* was "the sources and scope of the power of an Indian tribe to regulate hunting and fishing by non-Indians on lands within its reservation owned in fee simple by non-Indians." *Montana*, 450 U.S. at 547, 101 S.Ct. at 1249.

occupy and exclude"). *Strate*, 520 U.S. at 442-43, 456-60, 117 S.Ct. at 1408, 1414-16. *Strate* thus dictates that the *Montana* analysis controls the resolution of this appeal. Specifically, *Strate* dictates that, absent an "express authorization [of tribal jurisdiction] by federal statute or treaty," the analytical framework of *Montana*—i.e., the "general proposition" with its two exceptions—governs the determination of tribal civil adjudicative jurisdiction with respect to suits in which a nonmember is a party. *Strate*, 520 U.S. at 445, 117 S.Ct. at 1409.

¶24    In *Nevada v. Hicks*, 533 U.S. 353, 121 S.Ct. 2304 (2001), the Court clarified that the *Montana* framework governs the determination of tribal civil adjudicative jurisdiction regardless of the status of the land where the conduct at issue occurred or where the claim arose. Specifically, Justice Scalia stated, in writing for the Court, that *Montana* "announc[ed] the general rule of no jurisdiction over nonmembers" and "clearly impl[ied] that the general rule of *Montana* applies to both Indian and non-Indian land. The ownership status of land, in other words, is only one factor to consider in determining whether regulation of the activities of nonmembers is 'necessary to protect tribal self-government or to control internal relations.' " *Hicks*, 533 U.S. at 359-60, 121 S.Ct. at 2310. *See also Hicks*, 533 U.S. at 381, 121 S.Ct. at 2322 (Souter, J., concurring, joined by Kennedy, J., and Thomas, J.) ("After *Strate*, it is undeniable that a tribe's remaining inherent civil jurisdiction to adjudicate civil claims arising out of acts committed on a reservation depends in the first instance on the character of the individual over whom jurisdiction is claimed, not on the title to the soil on which he acted."); *Hicks*,

13

533 U.S. at 387, 121 S.Ct. at 2324-25 (O'Connor, J., concurring in part and concurring in the judgment, joined by Stevens, J., and Breyer, J.) ("Today, the Court finally resolves that *Montana v. United States*, 450 U.S. 544 (1981), governs a tribe's civil jurisdiction over nonmembers regardless of land ownership.").

¶25    We note that while TTC acknowledges *Montana* as controlling authority, TTC also suggests that we condition our reliance on the *Montana* framework by adopting a presumption purportedly expressed by the United States Supreme Court.  Specifically, TTC asserts that the CSKT Tribal Court derives "broad civil jurisdiction from the doctrine of inherent Tribal sovereignty" and that "[c]ivil jurisdiction over disputes between tribal members and other entities, arising in whole or in part on the Reservation, lies presumptively within the Tribal Court."  In support of this assertion, TTC cites *Iowa Mutual Ins. Co. v. LaPlante*, 480 U.S. 9, 107 S.Ct. 971 (1987).  However, in *Strate*, the Court expressly rejected this distorted representation of *Iowa Mutual*.  First, the Court noted that *Iowa Mutual* did not establish tribal adjudicative authority, even over the lawsuit involved in that case, but rather, described an "exhaustion rule allowing tribal courts initially to respond to an invocation of their jurisdiction."  *Strate*, 520 U.S. at 448, 117 S.Ct. at 1410.  The Court then quoted the subject language in *Iowa Mutual*: "Tribal authority over the activities of non-Indians on reservation lands is an important part of tribal sovereignty.  Civil jurisdiction over such activities presumptively lies in the tribal courts . . . ."  *Strate*, 520 U.S. at 451, 117 S.Ct. at 1412 (internal citations and internal quotation marks omitted).  In rejecting the notion of broad tribal civil jurisdiction, such as

14

TTC would have us adopt here, the Court read the subject language "in context," stating that, in light of the authorities cited therein,

> the *Iowa Mutual* statement emphasized by petitioners does not limit the *Montana* rule. In keeping with the precedent to which *Iowa Mutual* refers, the statement stands for nothing more than the unremarkable proposition that, where tribes possess authority to regulate the activities of nonmembers, "[c]ivil jurisdiction over [disputes arising out of] such activities presumptively lies in the tribal courts."

*Strate*, 520 U.S. at 453, 117 S.Ct. at 1413 (alterations in original). The Court then reiterated its point, stating that *Iowa Mutual* does "not expand or stand apart from Montana's instruction on the inherent sovereign powers of an Indian tribe." *Strate*, 520 U.S. at 453, 117 S.Ct. at 1413 (internal quotations omitted). Accordingly, we proceed here without assuming any inherent tribal jurisdiction to adjudicate suits involving nonmembers, but rather, following the *Montana* analysis as did the Court in *Strate*.

¶26 As noted, Zempel is not a member of CSKT. Further, TTC has not presented any federal statute or treaty that provides for tribal jurisdiction in cases such as this. Thus, we must determine whether either of the *Montana* exceptions allows for tribal adjudicative jurisdiction here. In conducting this analysis, we note that the party asserting the existence of tribal adjudicative jurisdiction under the *Montana* exceptions has the burden of demonstrating the facts necessary to support that assertion. *Strate*, 520 U.S. at 456, 117 S.Ct at 1414; *Atkinson*, 532 U.S. at 654, 659, 121 S.Ct. at 1832, 1835.

¶27 Before proceeding, we must specify the meaning of a critical term in this analysis. Although the *Montana* Court referred to "nonmembers" and "non-Indians"

15

interchangeably, the relevant distinction in a determination of inherent tribal civil[7] jurisdiction, with respect to the status of individuals, is between tribal members and nonmembers. *Hicks*, 533 U.S. at 377, n.2, 121 S.Ct. at 2319, n.2 (Souter, J., concurring, joined by Kennedy, J., and Thomas, J.) ("the relevant distinction, as we implicitly acknowledged in *Strate*, is between members and nonmembers of the tribe."). Indians may be tribal members or nonmembers. Thus, for the purposes of a tribal civil jurisdiction analysis, the term "non-member" encompasses anyone who is not a member of the tribe at issue, including Indians who are members of a different tribe, as well as Indians who are not members of any tribe. Accordingly, we do not employ the terms "Indian" and "non-Indian" to describe an individual=s personal status for the purposes of our jurisdictional analysis.

### The "Consensual Relationship" Exception

¶28    The first *Montana* exception recognizes inherent tribal authority to exercise civil adjudicative jurisdiction with respect to "activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." *Strate*, 520 U.S. at 456-57, 117 S.Ct. at 1415 (internal quotation marks omitted).

---

[7]   In *Oliphant v. Suquamish Tribe*, 435 U.S. 191, 212, 98 S.Ct. 1011, 1022-23 (1978), the United States Supreme Court held that Indian tribes lack criminal jurisdiction over non-Indians. In *Duro v. Reina*, 495 U.S. 676, 684-85, 110 S.Ct. 2053, 2059 (1990), the Court held that Indian tribes also lack criminal jurisdiction over nonmember Indians. Shortly after *Duro* was decided, Congress provided for tribal criminal jurisdiction over nonmember Indians. *See* 25 U.S.C. § 1301(2).

¶29 This exception establishes a three-part test to determine whether a nonmember's relationship serves as the basis for tribal jurisdiction. The relationship: (1) must be consensual; (2) must involve a tribe or a tribal member; and (3) must be entered into through commercial dealings, contracts, leases, or "other arrangements." We conclude that the relationship at issue here does not qualify because it did not involve "the tribe or its members" and it can not be considered "consensual." Either of these facts, independently, precludes a finding of tribal jurisdiction under the first *Montana* exception, as the three requirements noted above are conjunctive.

¶30 The conduct at issue here is TTC's alleged negligence in serving alcoholic beverages to Zempel and failing to prevent Moore from attempting to drive him home. The relationship from which this conduct arises is that between TTC and Zempel.[8] TTC does not claim to be a tribal member. Indeed, the membership provisions of CSKT's Constitution, found in Article II, do not allow for corporations to obtain membership status. However, TTC repeatedly asserts that it is an "Indian-owned business" and suggests that Liberty's status as a tribal member somehow imbues the corporation with a tribal characteristic sufficient to establishes tribal jurisdiction. As noted above, it is well settled that a corporation maintains a legal identity which is "separate and distinct" from that of its shareholders. *Moats Trucking Co.*, 231 Mont. at 477, 753 P.2d at 885. Thus, we can not hold that TTC assumes the mantle of Liberty's tribal membership for

---

[8] As noted above, Zempel has not stated a claim against Liberty. Not surprisingly, then, TTC does not identify any relationship between Zempel and Liberty that could be analyzed under this exception. Thus, we are left to consider Zempel's relationship with TTC.

17

jurisdictional purposes. Accordingly, we take TTC for what it is; a corporate entity which exists by virtue of Montana law, and which derives income by selling alcohol to the public under privilege of a Montana liquor license.

¶31 Because the relationship at issue here is between TTC and Zempel, and because neither TTC nor Zempel are tribal members, no relationship with "the tribe or its members" exists to provide a basis for tribal jurisdiction under this exception. Moreover, even if TTC were a tribal member, its interaction with Zempel could not constitute a "consensual" relationship under this exception, as Montana statutory law prohibits Montana corporations from selling alcohol to individuals younger than twenty-one years of age. Section 16-3-301(3), MCA. Accordingly, we hold that CSKT's inherent sovereignty does not encompass adjudicative jurisdiction over this suit pursuant to *Montana=s* first exception.

## The "Self-Government" Exception

¶32 The second *Montana* exception recognizes inherent tribal authority to exercise civil adjudicative jurisdiction with respect to conduct that "threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Strate*, 520 U.S. at 457, 117 S.Ct. at 1415 (internal quotation marks omitted).

¶33 In *Strate*, the United States Supreme Court considered whether a tribal court retained the authority to adjudicate a nonmember's personal injury suit which arose from a car accident on a state highway running through a reservation. The Court held that the conduct at issue did not qualify under *Montana=s* second exception, stating:

18

Undoubtedly, those who drive carelessly on a public highway running through a reservation endanger all in the vicinity, and surely jeopardize the safety of tribal members. But if *Montana*'s second exception requires no more, the exception would severely shrink the rule.

*Strate*, 520 U.S. at 457-58, 117 S.Ct. at 1415. In conjunction with this holding, *Strate* provided critical guidance for understanding *Montana=s* second exception, stating:

Read in isolation, the *Montana* rule's second exception can be misperceived. Key to its proper application, however, is the Court's preface: "Indian tribes retain their inherent power to punish tribal offenders, to determine tribal membership, to regulate domestic relations among members, and to prescribe rules of inheritance for members. . . . But a tribe's inherent power *does not reach beyond what is necessary to protect tribal self-government or to control internal relations*."

*Strate*, 520 U.S. at 459, 117 S.Ct. at 1416 (emphasis added) (citation and alterations omitted).[9] Immediately thereafter, the Court concluded: "Neither regulatory nor adjudicatory authority over the state highway accident at issue is needed to preserve the right of reservation Indians to make their own laws and be ruled by them." *Strate*, 520 U.S. at 459, 117 S.Ct. at 1416 (citation and internal quotation marks omitted).

¶34 TTC claims, in conclusory fashion, that tribal jurisdiction is necessary to control CSKT's internal relations. However, TTC does not identify any internal tribal relation that would in fact be controlled by tribal adjudicative jurisdiction in this case, nor can we ascertain one.

---

[9] The *Atkinson* Court observed that "the impact of the nonmember's conduct must be *demonstrably serious* and must *imperil* the political integrity, the economic security, or the health and welfare of the tribe." *Atkinson*, 532 U.S. at 659, 121 S.Ct. at 1835 (emphasis added) (citation and internal quotation marks omitted).

¶35 TTC does not argue that tribal jurisdiction in this case is necessary to protect tribal self-government. We observe, however, that the alleged tortious conduct here could surely endanger all in the vicinity of TTC, which may include CSKT members and the general public, similar to the careless driving identified in *Strate*. This certainly implicates CSKT's interest in preserving the safety of its members. Moreover, the "health or welfare of the tribe" clause in *Montana=s* second exception, if read in isolation, would seem to be applicable here. However, in following the High Court's lead along the path marked by *Montana*, we can not equate this particular tribal interest in membership safety with the interest in protecting tribal self-government—i.e., "the right of [CSKT] to make [its] own laws and be ruled by them." *See Strate*, 520 U.S. at 459, 117 S.Ct. at 1416.[10] To do so would dramatically broaden the scope of *Montana=s* second exception and thereby, as noted in *Strate*, 520 U.S. at 458, 117 S.Ct. at 1415, "severely shrink" *Montana*'s general rule.

¶36 As noted above, the ownership status of land involved in a suit is a factor in determining a tribe's need to protect self-government or control internal relations. *Hicks*, 533 U.S. at 359-60, 121 S.Ct. at 2310. Once the ownership status of the land at issue is established, a court may then consider the interplay between the land, the conduct at

---

[10] *See also Boxx v. Long Warrior*, 265 F.3d 771, 773, 777 (9th Cir. 2001) (as amended, reported at 2001 U.S. App. LEXIS 24917) (holding that the Crow Tribe's "great concern" with "alcohol-related accidents" did not support tribal jurisdiction over a negligence suit involving a tribal member and a nonmember which arose out of a single vehicle accident that occurred within the exterior boundaries of the Crow Reservation on non-Indian fee land, and stating: "If we were to find jurisdiction here, the exception would swallow the rule because virtually every act that occurs on the reservation could be argued to have some . . . welfare ramification to the tribe.") (citation and internal quotations marks omitted).

issue, and tribal self-government. *See Ford Motor Co. v. Todecheene*, 394 F.3d 1170, 1172, 1182 (9th Cir. 2005) (identifying the land at issue as tribal trust land and then determining whether there existed any encroachment upon the land or damage thereto, and whether use of the land had been interfered with). Here, rather than discussing the ownership status of Montana Highway 212, where this tort claim arose,[11] or the ownership status of TTC's premises, where the conduct at issue occurred, TTC merely asserts, repeatedly and fervently, that it is located entirely within the exterior boundaries of the Flathead Indian Reservation; that it operates its business exclusively within the exterior boundaries of the Reservation; and that the transaction at issue took place on the Reservation.

¶37 However, these assertions do not address the relevant land issue—i.e., *ownership status* of the land implicated in the suit. As noted in *Hicks*, the ownership of lands on an Indian reservation may reside with the tribes, with tribal members, and even with nonmembers, among others. *Hicks*, 533 U.S. at 383, 121 S.Ct at 2322 (Souter, J., concurring, joined by Kennedy, J., and Thomas, J.). Thus, it avails TTC nothing to establish that that lands involved are located "within the exterior boundaries of the

---

[11] Although it runs through the Flathead Indian Reservation, Montana State Highway 212 is considered "alienated, non-Indian land" for the purposes of jurisdictional analysis. *Strate*, 520 U.S. at 454, 117 S.Ct. at 1413; *see also Wilson v. Marchington*, 127 F.3d 805, 813-14 (9th Cir. 1997). A tort claim cannot arise until all the elements of the tort, including damages, are present. *See Gabriel v. School Dist. No. 4, Libby*, 264 Mont. 177, 180-81, 870 P.2d 1351, 1352-53 (1994) (holding that because death is a necessary element in a wrongful death suit, the cause of action arises where the death occurs). "[A] tort is not wrongful conduct in the air; the arrow must hit its mark. Until there is hurt, there is no tort." *Heil v. Morrison Knudsen Corp.*, 863 F.2d 546, 550 (7th Cir. 1988) (internal citation omitted). Thus, while the underlying alleged conduct occurred on TTC's premises (the ownership status of which is unknown), Zempel's claim arose on the State highway.

Flathead Indian Reservation." As TTC fails to present any relevant argument as to how the ownership status of the land involved in this suit may factor into an analysis under the second *Montana* exception, we will not address the issue further.

¶38 Pursuant to *Strate*, we must recognize that CSKT's adjudicative jurisdiction "does not reach beyond what is necessary to protect tribal self-government or to control internal relations." *Strate*, 520 U.S. at 459, 117 S.Ct. at 1416 (citation and internal quotation marks omitted). The conduct at issue here—TTC's alleged negligence in serving alcoholic beverages to Zempel and failing to prevent Moore from attempting to drive him home—while potentially dangerous to individual tribal members, does not pose a threat to CSKT's self-government. Thus, tribal adjudicative jurisdiction over this action is not necessary to preserve CSKT's right to make its own laws and be ruled by them. As such, we hold that CSKT's inherent sovereignty does not encompass adjudicative jurisdiction over this suit pursuant to *Montana*'s second exception.

## CONCLUSION

¶39 The CSKT Tribal Court does not have jurisdiction over this case brought by a nonmember against a Montana corporation and a tribal member. TTC has failed to identify any federal statute or treaty that provides for tribal adjudicative jurisdiction here. Further, TTC has failed to demonstrate either a qualifying consensual relationship or a threat to tribal self-government that would overcome *Montana=s* general rule prohibiting tribal adjudicative jurisdiction over suits involving nonmembers. Thus, we conclude that

22

the District Court erred in dismissing Zempel's claim against TTC and Liberty on jurisdictional grounds.

¶40   We affirm the District Court=s dismissal of Herak.  We reverse the court's dismissal of TTC and Liberty and the consequent dismissal of Zempel's Complaint. Accordingly, we remand for further proceedings.


/S/ JAMES C. NELSON


We concur:

/S/ KARLA M. GRAY
/S/ PATRICIA COTTER
/S/ JOHN WARNER
/S/ W. WILLIAM LEAPHART
/S/ BRIAN MORRIS
/S/ JIM RICE