No. 04-360

IN THE SUPREME COURT OF THE STATE OF MONTANA

2007 MT 74

_____

TRAVIS, CALISTA and CONNOR HEGGEM,
for themselves as individuals and on behalf of
DANE HEGGEM, deceased,

        Plaintiffs and Appellants,

   v.

CAPITOL INDEMNITY CORPORATION,
Madison, Wisconsin,

        Defendant and Respondent.

_____

APPEAL FROM:    District Court of the Thirteenth Judicial District,
                 In and for the County of Yellowstone, Cause No. DV 03-731,
                 The Honorable Gregory R. Todd, Presiding Judge.

COUNSEL OF RECORD:

        For Appellants:

                A. Clifford Edwards and Roberta Anner-Hughes, Edwards, Frickle,
                Anner-Hughes & Cook, Billings, Montana

        For Respondent:

                Ross D. Tillman and Randy J. Cox, Boone Karlberg, P.C., Missoula,
                Montana

_____

                              Submitted on Briefs:  March 30, 2005
                                   Decided:  March 14, 2007

Filed:

      _____
                        Clerk

Chief Justice Karla M. Gray delivered the Opinion of the Court.

¶1     Thirteen-month-old Dane Heggem died in early 2003 as a result of a toxic dose of diphenhydramine administered at a day care facility. Dane's parents and brother asserted violations of Montana's Unfair Trade Practices Act by the insurer of the day care facility for misrepresenting the applicable liability limit of the insurance policy. They appeal from the judgment entered by the Thirteenth Judicial District Court, Yellowstone County, on its order granting summary judgment to the insurer. We affirm.

¶2     We address the following issues:

¶3     1. Did the District Court abuse its discretion in denying the Heggems' motion to conduct discovery on issues relating to interpretation of the insurance policy?

¶4     2. Did the District Court err in determining that the policy's provisions relating to the coverage available were unambiguous as a matter of law and the available policy limit was $300,000 as represented by the insurer, and in granting the insurer's motion for summary judgment on those bases?

BACKGROUND

¶5     Sabine Bieber and Denise Smith operated Tiny Tots group day care facility in Laurel, Montana. On the afternoon of January 31, 2003, Bieber discovered that Dane Heggem had failed to awaken from his midday nap at Tiny Tots. Dane was airlifted to St. Vincent's Hospital in Billings, Montana, where he was pronounced dead. Dane's death certificate described the cause of death as diphenhydramine (generic Benadryl®), and indicated the death occurred by Dane being given a toxic dose of that liquid allergy and cold medicine. The autopsy report indicated the cause of death as "most likely an

2

overdose of diphenhydramine."  Investigators for the State of Montana learned that, during the previous year, Tiny Tots had purchased enough diphenhydramine to supply more than eleven doses of the medicine per day, and that no directions to Tiny Tots from the Heggems or parents of other children explained the use of the medicine in that amount.

¶6     On March 18, 2003, Travis and Calista Heggem—Dane's father and mother—filed an action against Bieber and Tiny Tots which requested, in pertinent part, compensatory damages "in all categories available under Montana law" for Bieber's and Tiny Tots' negligent administration of Benadryl® which caused Dane's "last illness, suffering, and death."  Discovery ensued in that action.  In the spring of 2003, Bieber responded to an interrogatory by identifying Capitol as her insurer and the policy's liability limit as $300,000.

¶7     In mid-July of 2003, the Heggems' attorney made a demand on Capitol for settlement of the $300,000 policy limit in the action against Bieber and Tiny Tots. Capitol responded that it would pay the demand.  Within a week, the Heggems withdrew that demand and demanded $600,000.  Capitol refused the demand.

¶8     On July 25, 2003, the Heggems filed a complaint asserting Unfair Trade Practices Act (UTPA) violations and misrepresentation against Bieber and Capitol.  In quick succession, they filed a first amended complaint and a second amended complaint.

¶9     The second amended complaint named Capitol as the only defendant.  It alleged that the State had filed criminal charges against Bieber in July of 2003 in connection with Dane's death and—along the same lines as its action against Bieber and Tiny Tots—that

3

Bieber had given Dane the lethal dose of diphenhydramine which caused his death. The Heggems further alleged that, since Bieber's liability was reasonably clear by that time, Capitol's obligation was to honestly represent the insurance coverage available. They asserted that Capitol violated the UTPA, §§ 33-18-101 through -1006, MCA, by misrepresenting the maximum amount of liability insurance available when it offered the Heggems $300,000 as the available policy limit in the action against Bieber and Tiny Tots. The Heggems alleged entitlement under their third-party rights to twice the policy limit under an Aggregate Limits provision in the Capitol policy for "all 'occurrences'" during a policy period, referencing the claims very broadly alleged in the separate action against Bieber and Tiny Tots. In the latter regard, the Heggems alleged these claims "triggered the multiple aggregate claims provisions" in Capitol's policy. Finally, the second amended complaint alleged a first-party claim, based upon a written assignment to them by Bieber of her first-party rights, claiming that Capitol breached its obligations to Bieber under the UTPA by failing to settle the underlying suit within the alleged $600,000 policy limit and failing to obtain a release for Bieber.

¶10 Capitol answered the second amended complaint in September of 2003, denying the allegation it had violated the UTPA. It also moved to dismiss the third-party claims in this UTPA action pursuant to § 33-18-242(6)(b), MCA, which provides that a third-party claimant may not file an action until after the underlying claim has been settled or judgment entered for the claimant. The Heggems promptly opposed the motion to dismiss, primarily on the basis that the question presented under their third-party claims is the same as that presented under their first-party claims, which may be filed prior to a

4

settlement or judgment on the underlying claim. *See* § 33-18-242(6)(a), MCA. Briefing on Capitol's motion to dismiss was completed.

¶11 Capitol also moved for summary judgment on the entirety of the UTPA action on the basis that its maximum liability to the Heggems under the policy is $300,000. It argued that the policy language at issue was unambiguous and sought a determination as a matter of law that the term "occurrence" used in the policy limits its liability to $300,000. Capitol asserted that, even assuming the truth of the Heggems' allegation of entitlement to damages in the separate action against Bieber and Tiny Tots, it is liable for only one "occurrence"—Dane's death—as defined in the insurance policy.

¶12 On the same day it filed its motion for summary judgment, Capitol moved for a protective order with regard to answering discovery requests from the Heggems. It asked the District Court to stay factual discovery until the court had rendered a legal determination interpreting the liability policy at issue. The Heggems responded in opposition and moved for discovery pursuant to M. R. Civ. P. 56(f) for purposes of addressing the summary judgment motion. They stated the discovery sought related to "the pertinent facts behind [Capitol's] drafting, underwriting, sale, and use of its Aggregate Limits provision." The parties agreed to suspend further briefing on the motion for summary judgment pending a ruling on the discovery motion. The District Court later granted Capitol's motion for protective order, stayed further activities in this case (and in the earlier action against Bieber and Tiny Tots) and, in December of 2003, denied the Heggems' motion for discovery.

¶13 In January of 2004, after the Heggems filed a negligence action against Smith,

5

they filed their brief—and numerous exhibits—in opposition to summary judgment in the present action. Capitol replied.

¶14 In March of 2004, the District Court granted summary judgment to Capitol, concluding the Heggems' claims were based on a single occurrence during a single policy period, and determining Capitol's liability to the Heggems cannot exceed $300,000. Then, without ruling on Capitol's motion to dismiss, the court entered judgment in favor of Capitol on the policy interpretation, and Capitol filed notice of entry of judgment.

¶15 The District Court having failed to rule directly on Capitol's motion to dismiss the Heggems' third-party claims, the Heggems moved for certification of the judgment as final for purposes of appeal pursuant to M. R. Civ. P. 54(b). They later withdrew that motion, however, upon the parties' agreement that certification was "neither necessary nor appropriate" and the judgment was ripe for appeal. The District Court entered an order agreeing with the parties, stating, "the Court's Judgment entered March 26, 2004 is stipulated by the parties (and the Court agrees) as final and dispositive of all issues in the [UTPA] action."

¶16 The Heggems appeal from the judgment entered by the District Court on its order granting summary judgment to Capitol. They raise the two issues set forth above and resolved below.

STANDARDS OF REVIEW

¶17 We review a district court's discovery rulings for abuse of discretion. *Spooner Constr. & Tree Service, Inc. v. Maner*, 2000 MT 161, ¶ 24, 300 Mont. 268, ¶ 24, 3 P.3d

6

641, ¶ 24 (citation omitted). Under M. R. Civ. P. 56(c), summary judgment is proper when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Overall, we review a summary judgment decision *de novo*. *Wages v. First Nat. Ins. Co. of America*, 2003 MT 309, ¶ 9, 318 Mont. 232, ¶ 9, 79 P.3d 1095, ¶ 9 (citation omitted).

## ISSUE 1

¶18 **Did the District Court abuse its discretion in denying the Heggems' motion to conduct discovery on issues relating to interpretation of the insurance policy?**

¶19 In responding to Capitol's motion for summary judgment, the Heggems also moved for discovery under M. R. Civ. P. 56(f), seeking factual information relating to Capitol's interpretation of the Aggregate Limits provision of its insurance policies in other cases. The District Court denied the motion, determining the Heggems had not met the requirements of M. R. Civ. P. 56(f) and, since Capitol's motion for summary judgment sought a legal interpretation that the policy was clear and not ambiguous, the discovery requested would be irrelevant at that time.

¶20 M. R. Civ. P. 56(f) provides that, if it appears from affidavits filed by a party opposing a summary judgment motion that the party cannot timely present facts necessary to justify its opposition to the motion, a district court may deny the motion for summary judgment or continue the proceedings. Here, the Heggems did not file the affidavit required by M. R. Civ. P. 56(f) in conjunction with their Rule 56(f) motion. Therefore, we conclude the District Court did not abuse its discretion in denying the Heggems' M. R. Civ. P. 56(f) motion for failure to meet the requirements of the rule.

7

Consequently, we need not address the District Court's second rationale for denying the Heggems' motion.

ISSUE 2

**¶21  Did the District Court err in determining that the policy's provisions relating to the coverage available were unambiguous as a matter of law and the available policy limit was $300,000 as represented by the insurer, and in granting the insurer's motion for summary judgment on those bases?**

¶22  The language of a contract governs its interpretation if that language is clear and explicit. Section 28-3-401, MCA. Interpretation of an insurance contract is a question of law. *Augustine v. Simonson*, 283 Mont. 259, 263, 940 P.2d 116, 118 (1997) (citation omitted). Courts must look at an insurance contract as a whole and attempt to reconcile the various parts to give each meaning and effect. *Farmers Alliance Mut. Ins. Co. v. Holeman*, 1998 MT 155, ¶ 25, 289 Mont. 312, ¶ 25, 961 P.2d 114, ¶ 25 (citation omitted). An ambiguity exists when an insurance contract, taken as a whole, is reasonably subject to two or more different interpretations. *Holeman*, ¶ 25 (citation omitted). However, a court may not create an ambiguity where none exists, nor may a court rewrite an insurance policy by ignoring clear and unambiguous language to accomplish a "good purpose." *See Stillwater Condominium Ass'n v. American Home Assur. Co.*, 508 F. Supp. 1075, 1080 (D. Mont. 1981), *aff'd* 688 F.2d 848 (9th Cir. 1982).

¶23  Capitol's motion for summary judgment sought an interpretation, as a matter of law, that it did not misrepresent its express and unambiguous policy language, which set the liability limit for any one occurrence at $300,000. Capitol's motion and brief—interpreting the "one occurrence" provision in the policy—were based on the allegations

8

set forth in the Heggems' earlier action against Bieber and Tiny Tots and their second amended UTPA complaint: primarily, that Bieber gave Dane the lethal dose of diphenhydramine which caused his death, and that—pursuant to the "all occurrences" policy language—the various claims in their separate action against Bieber and Tiny Tots "triggered the multiple, aggregate claims provision" in Capitol's policy. The Heggems' response brief and exhibits, submitted after they filed a separate action against Smith, relied to a large extent on a theory that the aggregate limits of the policy applied because multiple persons have multiple claims caused by two tortfeasors, Bieber and Smith. In other words, they relied on a "multiple occurrences" theory. The Heggems argued summary judgment was improper because there had been more than one "occurrence" in this case, thereby invoking the $600,000 Aggregate Limits provision of the policy. Capitol replied, pointing out—among other things—this shift away from the allegations in the UTPA second amended complaint.

¶24    The policy at issue states Capitol will pay sums the insured becomes legally obligated to pay as damages because of bodily injury. "Bodily injury" is defined as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." The "Limits of Insurance" provision states "[t]he most we will pay for loss or damage in any one occurrence is the applicable [$300,000] Limit of Insurance shown in the Declarations," regardless of the number of insureds, claims made, suits brought or persons or organizations making claims or bringing suits. "Occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." The policy's aggregate limit, which is twice the

9

$300,000 limit, is triggered only when there is more than one "occurrence" during a policy period.

¶25 The District Court concluded the Capitol policy language was clear and unambiguous and the Aggregate Limits provision of the policy was not invoked under the circumstances presented here. It determined the number of occurrences is determined by the number of causes, not the number of effects, rejecting the Heggems' contention that each person who brought a claim of injury as a result of Dane's death represents a separate "occurrence" under the Capitol policy. The court also rejected the Heggems' claim that alleged prior administrations of diphenhydramine to Dane were additional "occurrences" under the insurance policy. The court determined as a matter of law that the applicable policy limit was $300,000 and that Capitol had not violated the UTPA by misrepresenting that limit. It granted summary judgment to Capitol.

¶26 The District Court relied primarily on the policy language and analysis in *Greaves v. State Farm Ins. Co.*, 984 F. Supp. 12 (D.D.C. 1997), *aff'd,* 172 F.3d 919 (C.A.D.C. 1998), in reaching its conclusion that Capitol is liable to the Heggems for one "occurrence." *Greaves* was a declaratory judgment action brought against a landlord's insurer by the plaintiffs in an underlying negligence suit against the landlord for injuries and a death related to an apartment building fire. On cross-motions for summary judgment in the declaratory action, both parties asserted the policy language was clear, and the plaintiffs suggested alternatively that their interpretation "evinces . . . a profound ambiguity in the policy's coverage limitations." *Greaves*, 984 F. Supp. at 14. The plaintiffs argued the applicable policy limit of the owner's liability insurance was $2

10

million under an aggregate provision "for all occurrences during the policy's coverage period." *Greaves*, 984 F. Supp. at 14. They contended each person who suffered a bodily injury represented a separate occurrence under the policy. *Greaves*, 984 F. Supp. at 15. The insurer argued there was only one occurrence, with an available policy limit of $1 million. *Greaves*, 984 F. Supp. at 14.

¶27 Observing that disagreement over the meaning of an insurance provision does not render the policy ambiguous, the federal district court determined one fire caused the injuries and, thus, there was only one occurrence. Further noting that the vast majority of jurisdictions construe the term "occurrence" as used in insurance policies to refer to the cause or causes of the injury rather than the number of injuries, the court also rejected the plaintiffs' argument that each negligent act or omission which led to the fire constituted a separate occurrence. *Greaves*, 984 F. Supp. at 17 (citations omitted).

¶28 The District Court also relied on *Scottsdale Ins. Co. v. Robertson*, 788 N.E.2d 279 (App. Ct. Ill. 2003). There, several tenants injured by carbon monoxide poisoning in an apartment building had brought a negligence suit against the building owners. In *Scottsdale,* the building owners' insurer sought a declaratory judgment that it was liable for only one "occurrence." The Illinois court observed the well-settled law that the number of occurrences is determined by the number of causes and not the number of effects, and affirmed a trial court ruling that the insurance policy unambiguously established a limit per occurrence which applied regardless of the number of people who sustained injuries. *Scottsdale Ins.*, 788 N.E.2d at 282.

¶29 On appeal in the present case, the Heggems contend the Capitol policy does not adequately describe what constitutes an "occurrence," creating an ambiguity in which the language used is reasonably subject to two or more different interpretations. Capitol responds that this argument is raised for the first time on appeal and, for that reason, we should not address it. Capitol is correct that we do not address issues raised or new theories presented on appeal. *See, e.g.*, *City of Billings v. Peterson*, 2004 MT 232, ¶ 21, 322 Mont. 444, ¶ 21, 97 P.3d 532, ¶ 21 (citation omitted). Here, however, we will discuss the Heggems' contention because it is sufficiently intertwined with arguments considered by the District Court in its determination that Capitol's policy is clear and unambiguous as a matter of law.

¶30 The Heggems properly rely on *Leibrand v. National Farmers Union Property and Cas. Co.*, 272 Mont. 1, 6, 898 P.2d 1220, 1223 (1995) (citation omitted), for the proposition that, when an ambiguity exists, Montana courts construe an insurance policy provision against the insurer. However, a mere disagreement over the meaning of an insurance provision does not render the provision ambiguous. *See Greaves*, 984 F. Supp. at 17. Here, we conclude that none of the Heggems' proposed interpretations of "occurrence" under the Capitol policy are reasonable; nor are they supported by the case law upon which the Heggems rely.

¶31 In interpreting the term "occurrence" as used in liability policies which limit the insurer's liability to a specified amount per "occurrence," the vast majority of courts view it from the perspective of causation—referring to the cause or causes of the damage or injury—and not the number of injuries or claims. *CSX Transp., Inc. et al. v. Continental*

12

*Ins. Co.*, 680 A.2d 1082, 1091 (Md. 1996) (citations omitted). *See also Michigan Chemical Corp. v. Am. Home Assur. Co.*, 728 F.2d 374, 379 (6th Cir. 1984); Michael P. Sullivan, *What Constitutes Single Accident or Occurrence Within Liability Policy Limiting Insurer's Liability to a Specified Amount Per Accident or Occurrence*, 64 A.L.R. 4th 668 (2005). We adopt this "cause" theory for interpreting the term "occurrence" in an insurance liability policy that limits the insurer's liability to a specified amount per "occurrence."

¶32 Under the Heggems' first proposed interpretation, they are eligible for coverage under the Capitol policy for four different "occurrences." As argued, those occurrences are Bieber's administration of a toxic dose of diphenhydramine to Dane; Smith's negligent failure to prevent Bieber's act; the family's learning of the facts concerning Dane's death (which they contend caused them emotional damage); and their learning of the facts concerning Smith's failure to prevent Bieber's act (which they contend also caused them emotional damages).

¶33 The Heggems rely on *Arizona Property and Cas. Ins. Guar. Fund v. Helme,* 735 P.2d 451 (Ariz. 1987), in support of this interpretation. *Helme* arose from an underlying action in which an accident victim's survivors claimed two physicians had negligently failed to look at x-rays of the victim's spine in connection with consultation and surgery following the accident. During the litigation, each doctor stipulated to his own negligence in failing to either review the x-rays or to recognize the problem revealed by those x-rays. *Helme*, 735 P.2d at 455. The doctors' insurer then brought *Helme*, a declaratory judgment action, to limit its obligation to pay claims to the policy limit for

13

one "occurrence." The Supreme Court of Arizona determined that, because the first doctor did nothing to cause the second doctor to fail to examine the x-rays, the two failures constituted separate, unrelated causal acts which resulted in the injury and, consequently, the complaint alleged two separate occurrences. As a result, the survivors could recover for claims against both doctors under the liability policy. *Helme*, 735 P.2d at 458.

¶34 Here, the policy definition of an "occurrence" is somewhat similar to the policy language in *Helme* in that it encompasses an "accident" caused by "continuous or repeated exposure to substantially the same general harmful conditions." However, unlike in *Helme*, no facts of record in the underlying case against Bieber and Tiny Tots are before us. Moreover, both the earlier action and the UTPA second amended complaint at issue here allege only one cause: Bieber's lethal dose of diphenhydramine. That is the only cause alleged at the times Bieber and Capitol represented the available policy limit as $300,000. The allegation that Smith failed to stop Bieber's administration of the medicine—assuming the Heggems could establish she had an opportunity or authority to stop it—had not been made at that time.

¶35 The other two "occurrences" claimed by the Heggems under this interpretation are the family's learning of the cause of Dane's death and their learning of Smith's failure to prevent it. However, neither the family's learning of the cause of death nor the "learning of Smith's failure" to prevent the death had been alleged as an occurrence at the times the policy limit was represented as $300,000. In any event, both of these two alleged occurrences focus on results, not acts or omissions, and cannot reasonably be termed

14

"causal acts."  As a result, *Helme* does not support interpreting these "results" as separate "occurrences" under the Capitol policy at issue here.

¶36    Under the Heggems' second proposed interpretation, each alleged dose of diphenhydramine given to Dane at Tiny Tots and each alleged failure of Smith to warn the Heggems that Dane was being medicated constituted an "occurrence."  Under this interpretation, the Heggems contend Capitol is liable for the aggregate limits of the policy for two separate years, because they claim some doses were given to Dane in the policy year prior to the one in which he died.  They rely on *New Hampshire Ins. Co. v. RLI Ins. Co.*, 807 So.2d 171 (Fla. Dist. Ct. App. 2002), and *American Indem. Co. v. McQuaig*, 435 So.2d 414 (Fla. Dist. Ct. App. 1983), but neither case supports the Heggems' second proposed interpretation or their contention that the term "occurrence" is ambiguous in the Capitol policy.  Before discussing the cases, it is important to again observe that neither of the allegations raised in this second proposed interpretation had been asserted at the times the policy limit representations were made in the spring and summer of 2003.

¶37    In *New Hampshire Ins.*, the Florida District Court of Appeal—applying the "cause" theory—held that three gunshots fired by a condominium resident, each of which injured a different person, constituted three occurrences under the condominium association's insurance policy.  *New Hampshire Ins.*, 807 So.2d at 172.  Similarly, in *McQuaig*, the court determined that each of three shotgun blasts fired at deputy sheriffs by a mentally ill homeowner was a separate occurrence under the homeowner's insurance policy, resulting in insurer liability for three separate "occurrences."   The court

15

determined each act caused bodily injury independent of any other act. *McQuaig*, 435 So.2d at 416.

¶38 Here, based on the record before us and the time frame during which the available policy limit was represented, the insured's liability was premised on Dane's death from the overdose of diphenhydramine, the "bodily injury" as defined in Capitol's policy. No bodily injury to Dane was alleged regarding prior doses of the medication at that time. Unlike in *New Hampshire Ins.* or *McQuaig*, liability was incurred and the bodily injury to Dane arose from one alleged act—the overdose which caused Dane's death. As a result, neither *New Hampshire Ins.* nor *McQuaig*, which both rest on the "cause" interpretation we adopted above, supports the Heggems' theory as to multiple "occurrences."

¶39 Under the Heggems' third proposed interpretation, there were four occurrences: the loss of Dane's life, and the resulting emotional distress to the three surviving family members. They rely on *U.E. Texas One-Barrington, Ltd. v. General Star Indem. Co.*, 332 F.3d 274 (5th Cir. 2003), in support of an "effects" interpretation of "occurrence." *U.E. Texas*, however, focused on cause, not effects.

¶40 In *U.E. Texas*, the owner of 19 apartment buildings sought recovery from its insurer for water damages to the buildings from leaking pipes. The Fifth Circuit Court of Appeals affirmed a federal district court ruling that the water damage constituted 19 separate "occurrences;" as a result, the owner was required to pay 19 insurance deductibles. The Fifth Circuit Court deemed it significant that, although the pipes were all installed as part of a single plumbing system, different leaks were responsible for damage to each building. *U.E. Texas*, 332 F.3d at 278. The court stated that, under

16

Texas law, the proper focus in interpreting "occurrence" is on the events that cause the injury and give rise to the insured's liability, rather than on the number of injurious effects. *U.E. Texas*, 332 F.3d at 277. The court then stated, "t]he parties have stipulated that a different leak was responsible for the damage to each building, and as such we agree with the district court that each leak constitutes a separate occurrence as a matter of law." *U.E. Texas*, 332 F.3d at 278. The separate leaks were the causes of damages or injury; they were not the damages.

¶41 Here, in contrast to the 19 leaky pipes in *U.E. Texas*, the only alleged cause of Dane's death raised at the time of the policy limit representations was Bieber's lethal dose of diphenhydramine. *U.E. Texas*, a "cause" interpretation case, does not support the Heggems' third theory.

¶42 Contract terms are not ambiguous just because the parties disagree over their proper interpretation. *Michigan Chemical Corp.*, 728 F.2d at 378; *Greaves*, 984 F. Supp. at 15. Because none of the Heggems' proposed interpretations of "occurrence" is reasonable in the somewhat unique context of this case, the Heggems have not shown that "occurrence," as defined in the Capitol policy, is reasonably subject to two or more different interpretations. As a result, we conclude the Heggems have not established that the term "occurrence" as used in the Capitol policy is ambiguous. *See Holeman*, ¶ 25.

¶43 Finally, the Heggems contend the law on negligent infliction of emotional distress allows separate claims for each of them, citing *Treichel v. State Farm Mut. Auto. Ins. Co.*, 280 Mont. 443, 930 P.2d 661 (1997), and *Sacco v. High Country Independent Press, Inc.*, 271 Mont. 209, 896 P.2d 411 (1995). In those cases, we recognized an independent

17

cause of action for negligent infliction of emotional distress. *See Treichel*, 280 Mont. at 448, 930 P.2d at 665; *Sacco*, 271 Mont. at 220, 896 P.2d at 417-18.

¶44 Here, the Heggems' claims concerning negligent infliction of emotional distress were not alleged separately in the action against Bieber and Tiny Tots and had not been raised at the time representations of available policy limits were made in the spring and summer of 2003. In any event, those asserted claims do not relate to the number of occurrences for which Capitol is liable under its policy because of the policy language limiting coverage "regardless of the number of . . . claims made . . . or persons making claims." Moreover, the emotional distress claims are effects, not causes.

¶45 No ambiguity exists unless the language is reasonably susceptible to more than one interpretation. *See Michigan Chemical Corp.*, 728 F.2d at 378. We conclude that none of the alternative interpretations advanced by the Heggems is reasonable in light of the clear language of the Capitol policy, the cases advanced by the Heggems in support of their alternative interpretations, or the cause interpretation of an "occurrence" provision utilized by the vast majority of jurisdictions, which we have now adopted. Finally, and importantly, no ambiguity exists because at the time the representations of available policy limits—specifically at issue in this UTPA action—were made, the only alleged cause of Dane's death was Bieber's lethal dose of diphenhydramine.

¶46 Before closing, it is appropriate to address the Special Concurrence. The Special Concurrence is correct with regard to the manner in which this UTPA action should have proceeded and been resolved in the District Court. The case did not proceed in that fashion, however, and it is not this Court's job to "remake" the case presented to the

18

District Court. Nevertheless, the Special Concurrence provides valuable guidance to practitioners and district courts in future cases.

¶47    In summary, we hold that the District Court did not err in determining that the policy provisions relating to the coverage available were unambiguous as a matter of law and that the available policy limit was $300,000 as represented by Capitol. Therefore, we further hold that the District Court did not err in granting summary judgment to Capitol.

¶48    Affirmed.

/S/ KARLA M. GRAY

We Concur:

/S/ W. WILLIAM LEAPHART
/S/ JOHN WARNER
/S/ BRIAN MORRIS
/S/ JIM RICE

Justice James C. Nelson, specially concurring.

¶49    I agree with the Court that the District Court did not err in granting Capitol's motion for summary judgment, and I agree with much of the Court's analysis. However, I do not believe that the dispositive issue in this case and its proper resolution are made sufficiently clear in the Court's Opinion. Thus, I write separately to clarify that issue and why summary judgment was proper.

¶50    The parties have expended a great deal of effort in the District Court and in this Court arguing about whether Dane's death, in fact, involved more than one "occurrence"

and whether the limit of Capitol's liability arising out of Dane's death is, in fact, $300,000.00. As a result, this case has taken on the appearance of a declaratory judgment action concerning the amount for which Capitol is liable in the Heggems' separate actions against Bieber and Smith.[1] However, the questions of whether Dane's death *actually* constitutes just one "occurrence" and whether Capitol *actually* is liable for more than $300,000.00 are completely irrelevant in this case.

¶51 The Heggems brought this action under the Unfair Trade Practices Act (Title 33, Chapter 18, MCA; hereinafter, "UTPA"). Section 33-18-242(1), MCA, establishes a cause of action by an insured or a third-party claimant against an insurer for actual damages caused by the insurer's violation of subsection (1), (4), (5), (6), (9), or (13) of § 33-18-201, MCA. Although the Heggems did not reference a specific subsection of § 33-18-201 in any of the three versions of their complaint, it is apparent from their pleadings that they were proceeding under subsection (1), which prohibits an insurer from "misrepresent[ing] pertinent facts or insurance policy provisions relating to coverages at issue." Section 33-18-201(1), MCA. Indeed, they cite § 33-18-201(1) in their Response and Objection to Capitol Indemnity's Motion for Summary Judgment.[2]

---

[1] In this regard, the Heggems asserted in their Second Amended Complaint that "this is not an action for a 'declaratory judgment' regarding policy language." Yet, on appeal, they "ask this Court for a determination that the Capitol policies at issue afford coverage for the Heggems' claims in the amount of $1,200,000.00, as a matter of law."

[2] The Heggems also asserted in their Second Amended Complaint that "[t]he totality of the circumstances that [Capitol] has created in this case . . . also violates the Montana Consumer Protection Act, § 30-14-101 et seq., MCA, and constitutes unlawful and deceptive practices under § 30-14-103, MCA." Section 30-14-133(1), MCA, establishes a private cause of action for violation of the Consumer Protection Act. However, in their Response and Objection to Capitol Indemnity's Motion for Summary

¶52    As we recently explained in *Redies v. Attorneys Liability Protect. Soc.*, 2007 MT 9, 335 Mont. 233, 150 P.3d 930 (2007), a claim brought under the UTPA must be analyzed based on what the insurer knew at the time it allegedly violated the UTPA.  *See Redies*, ¶¶ 29, 40; *see also Graf v. Continental Western Ins. Co.*, 2004 MT 105, ¶ 17, 321 Mont. 65, ¶ 17, 89 P.3d 22, ¶ 17 ("The UTPA standards focus on what the insurer knows at a particular point in time—before trial, during the investigative settlement stage.").  Thus, a proper resolution of Capitol's motion for summary judgment requires analysis of the following questions:

1.    When did Capitol allegedly violate § 33-18-201(1)?
2.    What did Capitol know (related to the coverages at issue) at that time?
3.    What did Capitol represent at that time as the limits of liability under the coverages at issue?
4.    Did this constitute a misrepresentation of pertinent facts or insurance policy provisions relating to the coverages at issue?
5.    Is Capitol entitled to summary judgment on the Heggems' UTPA misrepresentation claim?

If the answer to any of the first four of these questions implicates a genuine issue as to a material fact, then summary judgment was improper.  M. R. Civ. P. 56(c).

¶53    1. When did Capitol allegedly violate § 33-18-201(1)?    Capitol allegedly misrepresented policy provisions during mid-2003, in the context of the Heggems' negligence action against Bieber and Tiny Tots, which was filed on or about March 18, 2003.  In particular, the Heggems identified in their Second Amended Complaint (with corresponding documentation attached to the complaint) three occasions on which

Judgment, the Heggems characterized the instant action as one brought under the UTPA; and on appeal, they neither mention the Consumer Protection Act nor raise a challenge pertaining to their allegations under that Act.  Thus, we need not address it.

Capitol had allegedly misrepresented policy provisions. First, the Heggems referenced an April 22, 2003 letter from Capitol's counsel to the Heggems' counsel, in which Capitol's counsel stated: "Please note that the business policy declarations indicate that $300,000.00 of limits exist for liability." Second, the Heggems' referenced Interrogatory No. 2 in their action against Bieber and Tiny Tots, which requested from Bieber and Tiny Tots "the limits of liability" for any "policy (policies) of insurance that you contend covered you on the dates described in the Complaint against the type of risk involved here." Bieber's April 30, 2003 response (which the Heggems alleged was made at the direction of Capitol) was that "the limits of liability" were "$300,000.00." Third, the Heggems referenced a July 25, 2003 telephone conversation between Capitol's counsel and the Heggems' counsel, which Capitol's counsel memorialized in a letter (dated that same day) as follows: "[Capitol] [was] prepared to and have asked me, on behalf of Sabine Bieber, to tender to you the sum of $300,000.00 which they believe is the total policy limit available on this case for liability and med pay." (The Heggems initiated the instant UTPA action that same day, i.e., on July 25, 2003.)

¶54 2. What did Capitol know (related to the coverages at issue) during mid-2003? When it responded to Interrogatory No. 2, and at the time of the communications between counsel for the Heggems and counsel for Capitol, Capitol had been presented with the Heggems' negligence claims against Bieber and Tiny Tots. In their complaint, the Heggems had alleged as follows:

> 1. To the defendant business, and owner, they trusted and entrusted, for day care, their beloved young son, Dane.

22

2. While in that care, in January, 2003, Dane, on those premises and under defendants' care, became unresponsive; was airlifted to St. Vincent Hospital, and then died, on January 31, 2003.

3. The State of Montana, and Yellowstone County authorities, after autopsy and investigation, have determined and written on Dane's death certificate that his death was "homicide."

4. The defendant business and owner, and each of them, had administered, negligently, and without the consent of Travis and Calista [Heggem], quantities of Benadryl to Dane, which Benadryl quantity caused his last illness, suffering, and death.

5. State of Montana authorities have determined and reported other children at Defendants' day care were also given quantities of Benadryl, without the consent or knowledge of those children's parents.

6. The negligent acts, as stated, of defendant day care and its owner, not only took Dane from Travis and Calista, as well as Dane's entire family structure, but the circumstances are of such character as to also require the imposition, upon defendants, and both of them, of substantial punitive damages, to punish, and more importantly, deter any such other tragic breaches of duties owed to Parents, and their children, when entrusted to day care.

The Heggems requested compensatory damages "in all categories available under Montana law . . . as a result of the circumstances surrounding the loss of their son, Dane"; punitive damages; and "[s]uch other relief as the Court deems just and proper."

¶55   3. What did Capitol represent during mid-2003 as the limits of liability under the coverages at issue?  $300,000.00.

¶56   4. Did this constitute a misrepresentation of pertinent facts or insurance policy provisions relating to the coverages at issue?  No; for the reasons which follow, the Heggems have not shown that there is a genuine issue of material fact with respect to this question.

¶57   The policy states that the most Capitol will pay for loss or damage in any one "occurrence" is the applicable Limit of Insurance shown in the Declarations:

23

$300,000.00. The most Capitol will pay for injury or damage arising from all "occurrences" during the policy period is twice this limit (i.e., $600,000.00). Under the "cause" theory of interpreting the term "occurrence" in an insurance liability policy that limits the insurer's liability to a specified amount per "occurrence," that term refers to the cause or causes of the damage or injury. *See* Opinion, ¶ 31. At the time of the alleged misrepresentations, Capitol had been presented with only one cause of Dane's death: Bieber's act of negligently administering diphenhydramine (Benadryl) to Dane. Thus, under the coverages then at issue, the limits of liability were $300,000.00.

¶58 The Heggems subsequently alleged that Smith's failure to act to protect Dane was a separate cause of Dane's death. *See*, *e.g.*, *Northwestern Nat. Cas. Co. v. Phalen*, 182 Mont. 448, 455, 597 P.2d 720, 724 (1979) ("[T]he word 'occurrence' is in fact broader than the word 'accident' and is so intended by the insurer. In such case, the intent of the policy is to insure the acts *or omissions* of the insured." (emphasis added)). However, the UTPA action is based on Capitol's representations in mid-2003, *before* the Heggems alleged Smith as a separate cause.

¶59 In addition, the Heggems subsequently proffered a number of interpretations of "occurrence" in support of their position. These interpretations reflected several different theories of relief based on multiple alleged administrations of diphenhydramine by Bieber and multiple alleged failures of Smith to act to protect Dane, all over multiple policy periods. *See* Opinion, ¶¶ 23, 32, 36, 39, 43. However, the complaint against Bieber and Tiny Tots contains no alleged prior acts of negligence and corresponding

24

injuries to Dane.[3] And there is nothing in the record of the communications in mid-2003 leading up to the filing of this UTPA action to suggest that the Heggems presented Capitol with such claims. To the contrary, the record discloses that these claims were articulated *after* the UTPA action had been filed.

¶60 The Heggems argued in their Response and Objection to Capitol Indemnity's Motion for Summary Judgment that Capitol had misrepresented pertinent policy provisions by "miserably fail[ing] to identify <u>at all</u> the aggregate limit set forth in the policy." Further, they accused Capitol and its counsel of "carefully <u>isolating and exploiting</u> the declarations page." They acknowledged that the statement of Capitol's counsel in the April 22, 2003 letter—specifically, "[p]lease note that the business policy *declarations* indicate that $300,000.00 of limits exist for liability" (emphasis added)—was "technically true," but they claimed that this statement "conceals the critical aggregate policy provision and is therefore <u>untrue</u> at best." The Heggems' assertions overlook two critical facts.

¶61 First, the Heggems had full access to the insurance policy, which was provided to them with the letter from Capitol's counsel dated April 22, 2003. There is no indication

---

[3] In their Second Amended Complaint in the instant action, the Heggems allege that their complaint against Bieber and Tiny Tots in the negligence action was "plead in broad terms so as to fully invoke all available claims under Montana law." Yet, while plaintiffs are generally not subject to any technical pleading requirements and complaints must be construed broadly in the plaintiff's favor, *Zempel v. Liberty*, 2006 MT 220, ¶¶ 16, 17, 333 Mont. 417, ¶¶ 16, 17, 143 P.3d 123, ¶¶ 16, 17, the Heggems' complaint against Bieber and Tiny Tots only references the administration of diphenhydramine on January 31, 2003, which caused Dane's "*last* illness, suffering, and death" (emphasis added), and requests compensatory damages "as a result of the circumstances surrounding *the loss* of their son, Dane" (emphasis added). This cannot fairly be read to raise claims arising out of Bieber's actions (and Smith's omissions) in 2002.

in the record that Capitol withheld or "conceal[ed]" pertinent provisions of the policy. Rather, the record and the allegations set forth in the Heggems' Second Amended Complaint reveal that the Heggems simply did not bother to "scour[] the policy" until July 21 or 22, 2003.[4]

¶62 Second, and more importantly, § 33-18-201(1) prohibits an insurer from misrepresenting "pertinent" insurance policy provisions "relating to coverages *at issue*" (emphasis added). It does not require the insurer to recite, in response to an interrogatory requesting "the limits of liability," every limit set forth in the policy; indeed, a statement that the Aggregate Limits amount is the limit of liability could be a misrepresentation if that coverage is not "at issue." And while § 33-18-201(4) requires the insurer to conduct "a reasonable investigation based upon all available information" before refusing to pay a claim, § 33-18-201(1) does not require the insurer, when responding to the claimant's inquiry as to the limits of liability, to conceive of every possible theory of relief the claimant may have, but has not yet articulated, and base its response on coverages that *could* be, but are not presently, at issue. Rather, § 33-18-201(1) requires the insurer to be forthcoming, truthful, and accurate with respect to "pertinent" insurance policy provisions relating to coverages "at issue." *Cf. Black's Law Dictionary* 1016 (Bryan A. Garner ed., 7th ed., West 1999) (defining "misrepresentation" as "a false or misleading statement about something" or "an assertion that does not accord with the facts").

---

[4] In a letter from the Heggems' counsel to Capitol's counsel, dated July 22, 2003, the Heggems' counsel states that he is "more than a bit taken aback at what we have discovered, during the past 24 hours"—namely, "that the true policy coverage for this tragic incident, and life-scarring event, is $600,000" (based on the Aggregate Limits provision).

¶63    In this regard, six months after Capitol made the alleged misrepresentations, the Heggems stated in their January 13, 2004 Response and Objection to Capitol Indemnity's Motion for Summary Judgment that "the Heggems have just begun to piece together what happened to Dane over many months at Tiny Tots. Those facts must drive application of insurance policy language." This latter statement is certainly true. It would be unreasonable, then, to expect Capitol to base its answer to Interrogatory No. 2 on facts that were neither presented to it nor implicated by the Heggems' allegations and claims against Bieber and Tiny Tots. To be sure, Capitol itself could have ascertained—indeed, it may have done so—that Smith's supposed failure to protect Dane was a separate cause of Dane's death. *See*, *e.g.*, *Ariz. Prop. & Cas. Ins. Guar. Fund v. Helme*, 735 P.2d 451, 458 (Ariz. 1987). But § 33-18-201(1) does not require an insurer, when responding to a "limits of liability" interrogatory in a negligence action, to formulate its response based on potential tortfeasors who are not named as defendants.

¶64    5. Is Capitol entitled to summary judgment on the Heggems' UTPA misrepresentation claim? The only remaining question is whether summary judgment in favor of Capitol was proper. As just explained, during the period in which the alleged misrepresentations were made, Capitol's liability under the policy was premised on only one cause of Dane's death: Bieber's act of negligently administering diphenhydramine to Dane on January 31, 2003. Under the "cause" theory of interpreting the term "occurrence," this one cause constitutes one "occurrence." Therefore, Capitol's statements that the limits of liability were $300,000.00 under the coverages then at issue were not misrepresentations. Accordingly, because there is no genuine issue as to any

27

material fact on the question of whether "$300,000.00" constitutes a misrepresentation of the policy provisions by Capitol, and because Capitol is entitled to judgment as a matter of law on the Heggems' UTPA misrepresentation claim, summary judgment for Capitol on that claim was proper.

¶65   In granting summary judgment to Capitol, the District Court concluded as follows: "This Court concludes that the Aggregate Limits provision of the policy is not invoked under the circumstances and Capitol Indemnity is entitled to judgment as a matter of law."   In reaching this conclusion, the court reasoned that "[caselaw] supports Capitol Indemnity's position that Dane's death was the result of a single cause constituting a single occurrence and that such occurrence gave rise to all damages regardless of the number of claims made or suits brought."   Further, the court reasoned that "[t]he Heggems have not shown that more than one occurrence has taken place under the circumstances for purposes of avoiding summary judgment."   However, the questions of whether Dane's death *actually* was the result of a single cause, whether Capitol *actually* was liable for only one "occurrence," and whether the Heggems' various claims against Bieber, Tiny Tots, and Smith *actually* trigger the Aggregate Limits provision are completely irrelevant—and are not capable of being resolved—in this UTPA action.

¶66   For one thing, at the time the District Court entered its order on March 15, 2004, a verdict had not been handed down in either of the negligence actions arising out of Dane's death.   Thus, the District Court could not state at this juncture that Bieber's administration of the diphenhydramine was, in fact, the "cause" of Dane's death.   That is an element of the tort claim against Bieber, which had yet to be proven.   Furthermore,

28

there may have been another cause of Dane's death, as alleged in the Heggems' negligence action against Smith for her failure to act to protect Dane. The District Court's suggestion that Dane's death was the result of a "single" cause, therefore, was inappropriate. Lastly, the Heggems did not need to show in this UTPA case that more than one "occurrence" had taken place under the circumstances of Dane's death. Rather, they needed to show that at the time of Capitol's alleged misrepresentations, they had presented Capitol with facts or allegations implicating more than one occurrence. They did not make this showing.

¶67 Accordingly, to the extent the District Court purported to issue a ruling in favor of Capitol's position "that Dane's death was the result of a single cause constituting a single occurrence and that such occurrence gave rise to all damages regardless of the number of claims made or suits brought," the court erred. However, because summary judgment was proper in this case—because Capitol did not, during the communications at issue here, misrepresent the limits of liability under the coverages then at issue as $300,000.00—the District Court reached the correct result.

¶68 On this basis, I concur in this Court's decision.

/S/ JAMES C. NELSON

Justice Patricia O. Cotter joins in the special concurrence of Justice James C. Nelson.

/S/ PATRICIA COTTER